1 So.3d 516 (2008)
STATE of Louisiana
v.
Cleveland LAWSON.
No. 08-KA-123.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 2008.
*519 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Tonia Williams, Kenneth P. Bordelon, William C. Credo, III, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, State of Louisiana, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS, and MADELINE JASMINE, Pro Tempore.
MARION F. EDWARDS, Judge.
Defendant-appellant, Cleveland Lawson ("Lawson"), was charged with second degree murder in violation of LSA-R.S. 14:30.1. Following a plea of not guilty and a Motion to Determine Competency, Lawson was found competent to stand trial. Prior to trial, the State filed a Notice of Intent to use certain statements and admissions as well as a Notice of Intent to Use Evidence of Other Bad Acts. Lawson filed a Motion in Limine to Exclude Evidence of Other Crimes. After a hearing, *520 the trial judge granted most of the State's requests, including the admissibility of a 911 tape and a letter written by Lawson, which was found at booking. The case was tried before a twelve-person jury, which found Lawson guilty as charged. His motion for new trial and post-verdict judgment of acquittal was denied. Afterwards, Lawson waived sentencing delays and was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Lawson appeals.
At trial, Kevin Curley ("Curley") testified that, on February 5, 2005, he and Lawson went to a gun store so Lawson could pick up the gun he had purchased one week prior. Afterwards, they went back to their apartment in Metairie. When they got home, they loaded the gun, and Curley showed Lawson how to shoot it. The gun was not working properly, so they decided to bring it back in a couple of days. Afterwards, one of them put the gun on top of the entertainment center in the living room. Curley wanted to put the gun on a shelf in the back room, but Lawson wanted to leave the gun on the entertainment center.
Meanwhile, Jonathan Green ("Green") drove the victim, Jamika Davalie ("Davalie"), to the apartment where she had previously lived with Lawson, her ex-boyfriend, so she could pick up her mail. Green waited in his car. Davalie opened the door of the apartment using her key and went in, telling Lawson that she had come to get her "stuff." Lawson, who was lying on the sofa, got up and said he would get it for her. He walked to the back room, and Davalie followed him, saying she would get it herself. Curley went to the kitchen and then, after a minute or two, heard a loud noise.
Curley testified that Lawson subsequently walked out of the bedroom with a puzzled look on his face saying he could not believe he had "done it." When Curley asked him what he meant, Lawson, who was holding the gun, told him he had shot Davalie. Curley stated that they had to "get out of here." Lawson put the gun in his duffel bag, and he and Curley left the apartment and caught a bus. During their conversation, Lawson told Curley that the shooting was an accident.
When Davalie did not return to the car, Green called her cell phone several times, but there was no answer. Green subsequently went to a gas station where he used the phone to call 911. He informed the dispatcher that Davalie had gone to the apartment but did not return, after which he went back to the apartment to wait for the police.
Deputy Gerard Patterson ("Deputy Patterson") arrived at the apartment complex a few minutes later and spoke to Green. The deputy knocked on the door of the apartment several times but got no answer. He opened the unlocked door and announced his presence, but there was still no answer. When he looked around, he saw Davalie lying on the bedroom floor with a gunshot wound to the head. Deputy Patterson called for medical services and for homicide detectives.
In the meantime, Curley and Lawson got off the bus, and Lawson called his sister and his cousin. They came to where Curley and Lawson were waiting and convinced Lawson to turn himself in. Lawson's sister and cousin drove Curley and Lawson back to the scene where the police were waiting. When Lawson exited the vehicle, he gave the duffel bag containing the gun to Deputy Scott Guillory. The deputy then transported him to the criminal investigations bureau where Detective David Morales ("Detective Morales") took a statement from him.
*521 In his statement, Lawson said that he and Davalie had broken up one month prior. He stated that, on the day in question, he went to get Davalie's mail and, when he turned around, Davalie had the gun pointed (at him). He claimed that he took the gun out of her hand and that, as he was pulling back, it accidentally went off. Lawson explained that he was four feet away from Davalie when the gun discharged.
After Detective Morales took defendant's statement, he went through Lawson's belongings in his duffel bag. Among the items he found was an undated letter addressed to Davalie and signed by Lawson.
Captain Timothy Scanlan ("Captain Scanlan"), an expert forensic scientist, testified that the gun was operable and in good working order and that it did not malfunction even after extensive testing. He also testified that the victim had no gunshot residue on her hands and that Lawson had none after the first test but, after the second test, the results were positive on his right hand.
Dr. Fraser Mackenzie ("Dr.Mackenzie"), an expert forensic pathologist, testified that he conducted the autopsy of Davalie. He further testified that the cause of death was a gunshot wound to the head with perforating wounds to the brain and that the manner of death was homicide. Dr. Mackenzie ruled out accidental death and suicide, testifying that the gun was placed directly on the head and discharged, and that there was no possibility that the gun was four feet away when the shot was fired.
The State also presented evidence of two prior incidents involving Lawson and Davalie. The first incident occurred on January 1, 2005, approximately one month before Davalie was killed. On that day, Deputy Chester Kowalski ("Deputy Kowalski") issued a misdemeanor summons to Lawson for domestic abuse battery, when Davalie stated Lawson had hit her in the face and knocked her down. The audiotape of the 911 call made by Davalie in connection with that incident was played for the jury.
The second incident occurred a few days before Davalie was killed. On that day, Davalie and her sister, Chaundrella Singer ("Singer"), were working at Memorial Medical Center when Singer received a call from Davalie, who was hiding in the restroom afraid to come out because Lawson had appeared at the hospital. When Davalie exited, Singer asked Lawson what he wanted, but he used vulgarities and insisted on talking only to Davalie. Singer called security, who asked Lawson to leave the premises. When Singer and Davalie walked to Davalie's car shortly thereafter, Lawson was standing by the car trying to intimidate them, cursing and insisting on talking only to Davalie. There was no police report filed.
After the State rested its case, Curley testified that Davalie called the apartment constantly and that he and Lawson asked her to stop calling. Annette Lawson, defendant's sister, testified that Lawson called and told her to come pick him up on the day of the shooting. She also testified that Lawson told her he accidentally shot Davalie.
Lawson testified that, on the day of the shooting, he was not expecting Davalie to come over. When she came into the apartment without knocking, she was cursing and irate with him. Lawson went into the bedroom, and Davalie followed him in there. He denied picking up the gun from the top of the entertainment center. When he turned around, he saw Davalie with the gun pointing at him, and her hand was shaking. After a while, Lawson *522 lunged for the gun, and they struggled. Lawson finally got the gun out of her hand, and as he was coming back, his finger accidentally hit the trigger. He denied pressing the gun against her forehead.
Lawson testified that he did not hit Davalie during the January 1, 2005 incident. He also testified that he did not go to Memorial Medical Center and intimidate Davalie. With respect to the letter found in his bag, Lawson explained that he was angry at Davalie and wrote the letter that day to inform her that he was going to move. He claimed that he was not contemplating suicide when he wrote that letter, and he explained that he never mailed the letter or delivered it to her. Regarding the gun, Lawson said he bought it to protect himself since he got off work between 2:00 and 3:30 a.m. and had to walk a long way home. He claimed that he did not intend to use the gun on Davalie.
During rebuttal, Captain Scanlan testified that the gun could not have been accidentally discharged, and that Lawson's version of the incident was highly improbable.
On appeal, Lawson argues that the evidence was legally insufficient to support his conviction because the State failed to prove he had the specific intent to kill or to inflict great bodily harm. He contends that the shooting was either an accident or justifiable homicide, asserting that the evidence presented proves, at most, that he was guilty of manslaughter. He also urges that the jury convicted him because of the inadmissible other crimes evidence and because it did not receive a justifiable homicide instruction.
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.[1] In the instant case, to prove second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1).
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). The determination of specific criminal intent is a question of fact.[2] Specific intent may be inferred from the circumstances and from the defendant's actions and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries.[3]
Lawson argues that the State failed to prove that he had the specific intent to kill or to inflict great bodily harm and contends that the shooting was either an accident or justifiable homicide. A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life *523 or receiving great bodily harm and that the killing is necessary to save himself from that danger." LSA-R.S. 14:20(A)(1). Lawson also argues that the evidence presented proves, at most, that he was guilty of manslaughter. LSA-R.S. 14:31(A)(1) defines manslaughter as a homicide which would be first or second degree murder, but the offense is committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. LSA-R.S. 14:31(A)(1).
Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense.[4] Rather, they are mitigatory factors which may reduce the grade of the offense. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence.[5] The question for this Court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence.[6] Whether sufficient provocation existed for the reduction of the grade of the offense to manslaughter is a question to be determined by the jury under the standard of the average or ordinary person, one with ordinary self-control.[7]
In the instant case, the evidence shows that Lawson and the victim ended their relationship a month before the shooting and that he was angry at her, in part, because he thought she was cheating on him. Lawson purchased the gun three weeks later. On the day of the incident, he brought the gun home from the store, loaded it, and placed it on the top of the entertainment center. The victim called Lawson sometime that day to inquire about her mail. According to Curley, Lawson had been lying on the sofa watching television and was not angry when the victim arrived prior to the incident, which occurred within a minute or two of her arrival. She entered the apartment unannounced, as she was prone to do, to get her mail, and when Lawson walked to the back room, the victim followed. None of Lawson's testimony indicated that he was caught in the throes of "sudden passion." Physical threats or actions on the part of the victim have been found to be sufficient provocation.[8] However, on review, the totality of the evidence does not support the claim that he shot the victim in "sudden passion" or "heat of blood." None of the evidence presented qualifies either as provocation sufficient to deprive an average person of his self-control and cool reflection, or as an event that would cause him to commit murder in sudden passion.
Although Lawson claimed that he shot the victim during a struggle, Dr. Mackenzie ruled out accidental death, explaining *524 that the gun was placed directly on the victim's head and discharged. Dr. Mackenzie also testified that there was no possibility that the gun was four feet away from the victim when the shot was fired, as Lawson claimed in his statement. Captain Scanlan testified that the gun could not have been accidentally discharged, that it was working properly, and that Lawson's version of the incident was highly improbable. The jury obviously found the State's witnesses more credible than Lawson, and the credibility of witnesses will not be reweighed on appeal.[9]
Considering the circumstances, Lawson's actions, and the extent and severity of the victim's injuries, we find the evidence was constitutionally sufficient to support the jury's finding that Lawson had the specific intent to kill or inflict great bodily harm to Davalie. Further, the act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill[10] Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the conviction.
Lawson also argues that the trial court erred by admitting evidence of other crimes or bad acts at trial, specifically objecting to the introduction of an audiotape of two 911 calls made on January 1, 2005 and the letter found after he was arrested. He also argues that the audiotape of the 911 calls was admitted in violation of Crawford v. Washington.[11]
In the pre-trial hearing on the State's Notice of Intent and Lawson's Motion in Limine, the State presented the testimony of Singer, who testified regarding the Memorial Medical Center incident. Deputy Kowalski testified regarding the January 1, 2005 incident, and Detective Morales testified regarding the letter discovered in Lawson's duffel bag after he was arrested for the victim's murder. The testimony of those witnesses at the hearing was similar to their trial testimony, except that of Deputy Kowalski was more detailed. Detective Morales testified at the hearing that he discovered a handwritten letter, addressed to the victim and signed by Lawson, in Lawson's duffel bag after he was arrested. The letter provides as follows:
Jamika
My time have [sic] come to an end so don't worry or be sad I'm in a better place and happy. Sorry for hurting you. F____k that[.] I'm going to tell you how I really feel. You B____ch everytime we like [sic] I'm the only one who did wrong. You f____ked other men in our house. All you ever did was complain know [sic] matter [sic] I tried to do for you. You always say you gave me everything but [sic] did you do for me[?] Never got a Christmas, Valentine's or Birthday gift from you but I gave to you. I paid all the bills around here [sic] you may have took [sic] out a loan but I paid it back not you. So you know what[?] It is your fault that I'm gone and you have to live with it. You never loved me if you *525 did you wouldn't have f____ked every man you met. You said I lied about everything but you lied mored [sic] than me. How could you cheat on me[?] I loved you. You killed me like you did your unborn child and I wish you rot in hell for that you whore.
Cleveland
The victim made two 911 calls. During the first call, she asked the operator to send a police officer to her apartment. In response to questioning, the victim told the operator that her boyfriend, later identified as Lawson, was throwing her "stuff" out but that they were both on the lease.
During the second call made a minute later, the victim said she had just called asking for the police. She then said frantically, "Let me go. My boyfriend just punched me in the face and threw me on the floor and I need the police to get here as soon as possible." The victim's voice was shaking. In response to questioning, the victim stated that her boyfriend was still there and that she did not need medical attention. She indicated that Lawson had punched her in the face and hit her in the eye, and that her eye was red, but not swollen, because it had just happened.
In the background, Lawson can be heard yelling and cursing at the victim, and the victim was crying at that point. The operator asked if that was Lawson fussing in the background, and the victim answered affirmatively. She also answered affirmatively when the operator asked her if she wanted to stay on the phone until the police arrived. In response to questioning, the victim said she was home alone with Lawson but that he did not have any weapons that she knew of. When the operator asked what he was doing, the victim said that he was moving her "stuff." The victim advised the operator that a key was stuck in the front door, but that the police could get in through the sliding door. She also told the operator what Lawson was wearing.
The trial judge found that the letter, the audiotape of the 911 calls the victim made on January 1, 2005, and evidence of the Memorial Medical Center incident were admissible.
Evidence of other crimes or bad acts committed by a criminal defendant, generally not admissible at trial, may be admitted by certain statutory and jurisprudential exceptions when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character.[12] Such evidence is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act. LSA-C.E. art. 404(B)(1).
One of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged[13] and the probative value of the extraneous evidence must outweigh its prejudicial effect. LSA-C.E. art. 403. The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence.[14] Absent an abuse of discretion, a trial court's *526 ruling on the admissibility of evidence pursuant to LSA-C.E. art 404(B)(1) will not be disturbed.[15]
In the instant case, Lawson argued that the shooting was accidental. Because intent was a material issue genuinely contested at trial, evidence of his prior act of violence toward the victim, i.e., the audiotape of the 911 calls, was admissible as it provided proof of his intent at the time of the offense to kill the victim or inflict great bodily harm on her.[16]
For evidence of motive to be independently relevant, it must be factually peculiar to the victim and the charged crime.[17] In this case, the State could not place the circumstances of the offense in their proper context without reference to the nature of the relationship existing between the victim and the Lawson. The tapes and letter demonstrate Lawson's ill will toward the victim because of their troubled relationship and its dissolution, and the primary purpose of the evidence was not to prove Lawson's bad character but to illustrate the volatile nature of his relationship with the victim. We find the evidence was relevant to show a motive for an otherwise apparently senseless shooting[18] and find no error in the admission of the tapes and letter.
In addition, admission of the tapes does not violate Crawford. Crawford held that testimonial hearsay statements may be admitted as evidence at a criminal trial only when the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.[19] In Davis v. Washington,[20] the court noted that, on the 911 tapes, the victim was speaking about events as they were happening rather than describing past events, that any reasonable listener would recognize that the victim was facing an ongoing emergency, and that the statements elicited were necessary to resolve that emergency.
On review of the audiotape of the 911 calls in the present case, it is clear that the primary purpose of the statements and the questioning by the 911 operator was to address and resolve an ongoing emergency. During those calls, the victim was speaking about events as they were actually happening, not describing past events. The victim's calls were plainly calls for help against a physical threat, and the statements elicited by the dispatcher were necessary to evaluate and resolve the present emergency and to provide the required police assistance rather than to learn what happened in the past. Additionally, the victim's frantic answers were provided over the phone in an unsafe environment. In light of the foregoing, we find the statements the victim made during the 911 calls *527 were not testimonial and, therefore, their admission did not violate the Confrontation Clause.
Lawson also urges that the trial court erred in refusing to give the jury a charge regarding justifiable homicide. He contends that an instruction on justifiable homicide was warranted because the incident was arguably a justifiable homicide, since he testified that the victim was the aggressor.
The record reflects that the court had a charge conference in chambers and, at that time, defense counsel indicated that the general charges proposed by the court were acceptable. Near the end of trial, the defense requested the following special instructions regarding justifiable homicide: (1) if defendant raises the defense of justification, the burden then shifts to the State to prove that the conduct was not justified; and (2) a reading of LSA-R.S. 14:20, the statute defining justifiable homicide.
The trial judge stated that he did not believe that a justifiable homicide charge was appropriate because the defense presented at trial was that the shooting was an accident, not justifiable homicide. Lawson urges that his rights were prejudiced because, as evidenced by their questions, the jury was torn on the issue of "who started it." The jury asked how many times the victim called Lawson, the length of each call, and the time the gun was picked up.
LSA-C.Cr.P. art. 802 mandates that the trial court instruct the jury on the law applicable to each case. The court is required to charge the jury on the law applicable to any theory of defense, when properly requested, which the jurors could reasonably infer from the evidence.[21] Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right.[22] When a special jury charge is not reduced to writing for presentation to the court, a trial judge may properly refuse to give such a charge. See, LSA-C.Cr.P. art. 807.[23] Article 807 also states that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly pertinent and correct. The evidence presented at trial must support the requested special charge.[24]
On appeal, Lawson admits that he shot and killed the victim but contends the evidence showed that the shooting was either an accident or committed in self-defense. In the instant case, Lawson testified that the victim pointed the gun at him and that it accidentally discharged during a struggle. We note that Lawson was larger than the victim, and there was no evidence that she had been any threat to him. The evidence showed that the gun would not have discharged accidentally, that Lawson shot her in the head at close range and, after doing so, did not attempt to obtain medical attention for her but, instead, fled the scene. Self-defense, in the present case, was a hypothetical argument lacking *528 any supporting evidence, and the jury's questions do not reveal ambivalence on this issue.
Additionally, defense counsel fully argued in his opening statement and closing argument that Lawson shot the victim in self-defense. Because he was able to present his argument about self-defense to the jury, there was no showing that he was prejudiced by the failure of the trial court to give the requested special jury charge.[25] Under all these circumstances, the trial court did not err in refusing to give the requested special charges.
This assignment of error is without merit.
PATENT ERROR REVIEW
We have reviewed the record for errors patent and find none.
For the foregoing reasons, the conviction and sentence are affirmed.
AFFIRMED
JASMINE, J., Concurs with Reasons.
JASMINE, J., Concurring with Reasons:
I find that the trial court erred in failing to give the requested charge on justifiable homicide. However, I find that the trial court's failure to give the requested charge would not likely have changed the result, and therefore, I concur in the majority opinion that affirms defendant's conviction.
NOTES
[1] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
[2] State v. Seals, 95-0305, p. 6 (La. 11/25/96), 684 So.2d 368, 373, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Gant, 06-232, p. 8 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599.
[3] State v. Graves, 99-113, p. 3 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, writ denied, 99-3013 (La.3/31/00), 759 So.2d 68.
[4] State v. Johnson, 01-1362, pp. 11-12 (La. App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32.
[5] Id.
[6] State v. Lombard, 486 So.2d 106, 111 (La. 1986).
[7] State v. Deal, 00-434, p. 5 (La. 11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002).
[8] State v. Ellis, 42,286 (La.App.2d Cir.7/11/07), 961 So.2d 636, writ denied, 07-1641 (La.1/25/08), 973 So.2d 753 (citing State v. Lombard, 486 So.2d 106 (La. 1986)).
[9] State v. Macon, 06-0481, pp. 7-8 (La.6/1/07), 957 So.2d 1280, 1285-86; State v. Rowan, 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
[10] State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Hidalgo, 95-319 (La.App. 5 Cir. 1/17/96), 668 So.2d 1188, 1197.
[11] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); also Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
[12] See, State v. Dauzart, 02-1187, p. 8 (La. App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
[13] See, State v. Jackson, 625 So.2d 146, 149 (La. 1993).
[14] State v. Dauzart, supra.
[15] State v. Williams, 02-645, p. 16 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
[16] See, State v. Ham, 93-1036 (La.App. 5 Cir. 2/15/95), 652 So.2d 15, writ denied, 95-1028 (La.3/17/97), 691 So.2d 69.
[17] State v. Lafleur, 398 So.2d 1074, 1080 (La. 1981); State v. Rose, (La.2/22/07), 949 So.2d. 1236.
[18] See, State v. Cotton, 07-782 (La.App. 5 Cir. 2/19/08), 980 So.2d 34 (citing State v. Walker, 394 So.2d 1181 (La. 1981) and State v. Welch, 615 So.2d 300, 303 (La.1993)).
[19] 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224.
[20] 547 U.S. 813, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006).
[21] State v. Marse, 365 So.2d 1319 (La.1978); State v. Patterson, 99-994 (La.App. 5 Cir. 1/25/00), 752 So.2d 280, writ denied, XXXX-XXXX (La.2/9/01), 785 So.2d 26.
[22] State v. Tate, 01-1658, p. 20 (La.5/20/03), 851 So.2d 921, 937, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
[23] State v. Davis, 00-278 (La.App. 5 Cir. 8/29/00), 768 So.2d 201, writ denied, 2000-2730 (La.8/31/01), 795 So.2d 1205.
[24] State v. Batiste, 06-824 (La.App. 5 Cir. 3/13/07), 956 So.2d 626, writ denied, XXXX-XXXX (La. 1/25/08) 973 So.2d 751.
[25] See, State v. Fish, 00-922, pp. 8-9 (La.App. 5 Cir. 1/30/01), 782 So.2d 1087, 1091-92, writ denied, 01-0548 (La.2/1/02), 808 So.2d 337.