EDWARD A. DUFRESNE, JR., Chief Judge.
 

 |2The Jefferson Parish District Attorney filed a bill of information on April 8, 2008, charging defendant, Robert Williams, with possession of a firearm by a convicted felon
 
 [1]
 
 in violation of LSA-R.S. 14:95.1. At the February 20, 2009 arraignment, defendant pled not guilty. Following the disposition of some pre-trial motions, the matter proceeded to trial on September 15 and 16, 2009. At the conclusion of the proceedings, the twelve-person jury found defendant guilty as charged. On September 25, 2009, the trial court sentenced defendant to imprisonment at hard labor for twelve years without benefit of parole, probation, or suspension of sentence. Defendant now appeals.
 

 FACTS
 

 On February 23, 2008, at approximately 1:48 a.m., Deputy David Chaplain, a fifteen-year veteran of the Jefferson Parish Sheriffs Office, was dispatched to Starrett and Jefferson Highway in reference to a possible fight. As he approached this high crime, high narcotics area, Deputy Chaplain observed a black female, later identified as April Curtis, leaning into the passenger side window of a white |struck. Thinking that a hand-to-hand drug transaction might be occurring, Deputy Chaplain illuminated the truck with his spotlight. When he did so, Curtis exited the window, and the truck quickly fled the area. Curtis started walking at a brisk pace, continually looking over her shoulder at Deputy Chaplain who was in a marked police unit and dressed in full uniform. She then started jogging toward a black Pontiac Grand Prix that was parked a couple of houses away from the white truck.
 

 Noticing that the Pontiac’s brake lights were on and were then turned off, the officer shined his spotlight on the Grand Prix. At that time, a black male, later identified as defendant, exited the driver’s side of the vehicle and began running fast toward a nearby carport. When the officer saw this, he exited his car and pursued defendant on foot. Defendant tried to scale a fence, but Deputy Chaplain was able to apprehend him and handcuff him for officer safety.
 

 
 *470
 
 At that same time, Curtis was trying to get into the passenger side of the Pontiac, but the door was apparently locked and would not open. Deputy Chaplain asked Curtis to come over by him, and she did so reluctantly. As the deputy then patted down defendant for weapons, Curtis walked back to the Pontiac and tried to open the door, but was unable to do so. Deputy Chaplain asked her to come back over to him again, and she complied. He also asked her to sit on the ground; however, she refused to do so, saying that she had not done anything wrong. According to the officer, Curtis was hostile and belligerent, and she and defendant were very nervous.
 

 Deputy Chaplain told Curtis he was going to handcuff her, but she walked to the car. He followed her. As they approached the car, Deputy Chaplain looked through the driver’s side window with a flashlight and saw the butt of a gun wedged between the seats. It was later learned that that gun was fully loaded, and 14there was extra ammunition on the passenger seat. Deputy Chaplain also saw one bag of green vegetable matter and a small baggie of off-white, rock-like objects that appeared to be crack cocaine.
 
 [2]
 

 Afterward, he attempted to handcuff Curtis; however, as he was trying to do so, she turned and struck him in the neck. A brief struggle ensued, but the deputy was able to handcuff her. Deputy Chaplain walked Curtis back to the carport and advised her and defendant that they were under arrest. He patted them down and located a set of car keys to the Pontiac in defendant’s front pants pocket. The officers subsequently checked their computer and found that defendant was the registered owner of the Pontiac.
 

 At trial, defendant admitted that the Pontiac was registered in his name; however, he claimed that a friend, with whom he shared the vehicle, had used the car that day. Further, defendant claimed that he was outside the car when the officer approached and did not run from the officer. Defendant denied putting the gun in the car. He stated that he first learned that the drugs and gun were in the car when the officer opened the door.
 

 ASSIGNMENT OF ERROR NUMBER ONE
 

 In his first assigned error, defendant challenges the trial court’s denial of his motion to suppress the evidence. On February 26, 2009, defendant filed a motion to suppress contending that the evidence sought to be used against him was illegally and unlawfully obtained and should be suppressed. On July 23, 2009, a hearing was held on the motion. At the hearing, Deputy Chaplain testified about the circumstances surrounding defendant’s stop and the subsequent seizure of the evidence. His testimony at the suppression hearing was almost identical to his [stestimony at trial as set forth in the statement of the facts and, therefore, will not be reiterated herein. After considering the evidence presented and the arguments of counsel, the trial judge denied defendant’s motion to suppress without providing reasons. Defendant now challenges this ruling.
 

 On appeal, defendant first contends that he was arrested without probable cause when he was handcuffed. He next asserts that, assuming this was only an investigatory stop, the police lacked reasonable
 
 *471
 
 suspicion to make that stop. Finally, he argues that, even if there was enough reasonable suspicion to conduct the stop, the handcuffing was unwarranted. The State responds that reasonable suspicion existed for the stop, and that handcuffing defendant was a detention for safety and did not rise to the level of an arrest.
 

 The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures.
 
 State v. Addison,
 
 05-878 (La.App. 5 Cir. 12/27/05), 920 So.2d 884, 890,
 
 writ denied,
 
 06-1087 (La.11/9/06), 941 So.2d 36. If evidence is derived from an unreasonable search or seizure, the proper remedy is to exclude the evidence from trial.
 
 State v. Boss,
 
 04-457 (La.App. 5 Cir. 10/26/04), 887 So.2d 581, 585.
 

 In a hearing on a motion to suppress, the State bears the burden of proof in establishing the admissibility of evidence seized without a warrant. LSA-C.Cr.P. art. 703(D). The trial court’s denial of a motion to suppress is afforded great weight, and it will not be set aside unless the preponderance of the evidence clearly favors suppression. To determine whether the trial court’s denial of a motion to suppress is correct, the appellate court may consider the evidence adduced at the suppression hearing as well as the evidence presented at trial.
 
 State v. Addison,
 
 920 So.2d at 890.
 

 | fiIn considering defendant’s arguments, we will first address the issue of whether the officer had reasonable suspicion to conduct an investigatory stop.
 

 It is well established that a police officer may conduct a brief investigatory stop when the officer has a reasonable articulable suspicion of criminal activity. LSA-C.Cr.P. art. 215.1;
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);
 
 State v. Belton,
 
 441 So.2d 1195, 1198 (La.1983),
 
 cert. denied,
 
 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). Reasonable suspicion is something less than probable cause to arrest. Rather, it requires that officers have sufficient knowledge of the facts and circumstances to justify an infringement of an individual’s right to be free of government interference.
 
 State v. Massey,
 
 03-1166 (La.App. 5 Cir. 1/27/04), 866 So.2d 965, 968.
 

 The facts upon which an officer bases an investigatory stop should be evaluated in light of the circumstances surrounding the incident. A reviewing court must take into consideration the totality of the circumstances and give deference to the inferences and deductions of a trained police officer that might elude an untrained person.
 
 State v. Burns,
 
 04-175 (La.App. 5 Cir. 6/29/04), 877 So.2d 1073, 1076.
 

 An officer’s mere unparticular-ized suspicion or hunch of criminal activity is insufficient to establish reasonable grounds to stop a person.
 
 State v. Barney,
 
 97-777 (La.App. 5 Cir. 2/25/98), 708 So.2d 1205, 1207. Factors that may support reasonable suspicion for an investigatory stop include an officer’s experience, his knowledge of recent criminal patterns, and his knowledge of an area’s frequent incidence of crimes.
 
 State v. Martin,
 
 99-123 (La.App. 5 Cir. 6/1/99), 738 So.2d 98, 102. While an individual’s mere presence in a high crime area, standing alone, is insufficient to justify an investigatory stop, his presence in a high crime area coupled with nervousness, startled behavior, flight or suspicious actions upon the |7approach of the officers, gives rise to reasonable suspicion for an investigatory stop.
 
 State v. Burns,
 
 877 So.2d at 1076.
 

 In
 
 Illinois v. Wardlow,
 
 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000),
 
 *472
 
 the United States Supreme Court held that an individual’s unprovoked flight through a high crime area in response to the approach of the police gave rise to reasonable suspicion for an investigatory stop.
 
 See also State v. Johnson,
 
 01-2081(La.4/26/02), 815 So.2d 809, 811, where the Louisiana Supreme Court found reasonable suspicion based on the defendant’s, nervousness, the lateness of the hour, and the fact that defendant quickened his pace as the police approached in a marked unit in a high crime area. Likewise, in
 
 State v. Burns,
 
 877 So.2d at 1077, this Court found that defendant’s unprovoked flight from the officers in a high crime area provided the requisite reasonable suspicion to justify the investigatory stop.
 

 In the instant case, at 1:48 a.m., Deputy Chaplain observed a female leaning into the window of a truck in a high crime, high narcotics area. Based on his experience, the deputy thought that a hand-to-hand narcotics transaction was occurring. When he illuminated the truck with his spotlight, the truck quickly fled, and the female walked at a brisk pace, then jogged, toward a Pontiac parked nearby. She nervously looked over her shoulder at Deputy Chaplain as she was proceeding toward the Pontiac. The deputy noticed that the brake lights of the Pontiac were on, and then they turned off. When he shined his spotlight at the Pontiac, defendant exited the driver’s seat of the vehicle and ran underneath a nearby carport.
 

 Considering the totality of the circumstances, including the high crime nature of the area^ the lateness of the hour, the possible drug transaction between the female and the individual in the truck, the female’s flight toward the Pontiac, Rand defendant’s flight away from the Pontiac, we find that the officer had reasonable suspicion to conduct an investigatory stop of defendant.
 

 Having found reasonable suspicion for the investigatory stop, the next issue to be addressed is whether the subsequent handcuffing of defendant was warranted, and whether the handcuffing elevated the encounter from an investigatory stop to an arrest.
 

 In
 
 State v. Morton,
 
 08-164 (La.App. 5 Cir. 7/29/08), 993 So.2d 651, 657, this Court discussed the law regarding when the use of handcuffs escalates a
 
 Terry
 
 stop into a de facto arrest requiring probable cause:
 

 Inherent in the right of police to conduct a brief investigatory detention is also the right to use reasonable force to effectuate the detention. There is no question that the use of handcuffs incrementally increases the degree of force that is used in detaining an individual. However, arrest-like features such as the use of drawn weapons and handcuffs may, but do not invariably, render the seizure a de facto arrest. Therefore, when the State seeks to prove that an investigatory detention involving the use of handcuffs did not exceed the limits of a
 
 Terry
 
 stop, the State must show some specific fact or circumstance that could have supported a reasonable belief that the use of restraints was necessary to carry out the legitimáte purpose of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm. If the added intrusion is not warranted under particular circumstances, a
 
 Terry
 
 stop may escalate into a de facto arrest requiring probable cause to render it valid.
 

 In the instant case, the record indicates that after defendant exited the Pontiac, he ran underneath a carport and tried to scale a fence. Deputy Chaplain, who was apparently alone at the time, then ran after defendant and was able to appre
 
 *473
 
 hend and handcuff him. Deputy Chaplain testified that he handcuffed defendant for officer safety. Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as are reasonably necessary to protect their safety and to maintain the status quo during the course of a
 
 Terry
 
 stop.
 
 State v. Morton,
 
 993 So.2d at 657. Considering the totality of the circumstances, we find that the deputy was justified in |9handcuffing defendant as a safety precaution in order to effectuate the
 
 Terry
 
 stop; those actions did not rise to the level of an arrest.
 

 Having determined that the officer lawfully stopped and handcuffed defendant, we further find that the officer was thereafter justified in seizing the evidence from the vehicle. In the instant case, the record reflects that while Deputy Chaplain was dealing with defendant, he observed April Curtis walk to the Pontiac several times and try to open the door, even though he told her to come back by him. When she refused to sit down as directed, the officer told her that he was going to handcuff her. Nonetheless, she proceeded to walk to the car, at which point Deputy Chaplain followed her. As the officer approached the car, he shined his flashlight into the driver’s side window and observed the butt of a gun wedged between the seats. He also saw a bag of green vegetable matter on the floorboard of the driver’s side of the vehicle, along with a small baggie of off-white, rock-like objects that appeared to be crack cocaine. After seeing the marijuana, cocaine, and gun in the vehicle, the officer had sufficient probable cause to believe the vehicle contained contraband so as to justify a warrantless search of the vehicle under the automobile exception.
 
 See State v. Joseph,
 
 02-717 (La.App. 5 Cir. 6/27/03), 850 So.2d 1049,
 
 writ denied,
 
 04-2404 (La.6/17/05), 904 So.2d 686.
 

 Based on the foregoing discussion, we find that the trial judge did not err in denying defendant’s motion to suppress evidence. The arguments raised by defendant in this assigned error are without merit.
 

 ASSIGNMENT OF ERROR NUMBER TWO
 

 In his second assigned error, defendant challenges the trial court’s admission of evidence of other crimes. Prior to trial, the State filed a notice of intent seeking to introduce evidence that at the same time defendant was in possession of a firearm, he was also in possession of marijuana and counterfeit cocaine. In this | innotice, the State indicated that, pursuant to LSA-C.E. art. 404 B(l), it would introduce the evidence for the purpose of proving motive, intent, plan, absence of accident, and as conduct constituting an integral part of the act or transaction that was the subject of this proceeding. After a hearing, the trial judge ruled that the evidence was admissible as res gestae, and further it related to motive and intent. The prosecutor then informed the court that, in connection with this ruling, he was going to call Detective Sergeant Joe Williams as an expert at trial to testify that guns were commonly used in the distribution of drugs.
 

 Defendant now argues that this other crimes evidence, including the testimony of the expert, was improperly admitted at trial and that his conviction should be reversed. Defendant contends that this evidence was unduly prejudicial and served no purpose other than to depict him as a drug dealer. The State responds that the marijuana was admissible as res gestae evidence, since the marijuana possession
 
 *474
 
 was part of defendant’s act of illegally possessing a firearm.
 

 Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. LSA-C.E. art. 404(B)(1);
 
 State v. Prieur,
 
 277 So.2d 126, 128 (La.1973). However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule.
 
 State v. Dauzart,
 
 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165. Such evidence is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act. |n LSA-C.E. art. 404(B)(1);
 
 State v. Lawson,
 
 08-123 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 525.
 

 One of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged, and the probative value of the extraneous evidence must outweigh its prejudicial effect. The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. Absent an abuse of discretion, a trial court’s ruling on the admissibility of evidence pursuant to LSA-C.E. art. 404(B)(1) will not be disturbed.
 
 State v. Lawson,
 
 1 So.3d at 525-526.
 

 Evidence of other crimes, wrongs, or acts may be introduced when it is independently relevant or when it relates to conduct, formerly referred to as res gestae, that constitutes an integral part of the act or transaction that is the subject of the present proceeding. In
 
 State v. Taylor,
 
 01-1638 (La.1/14/03), 838 So.2d 729, 741-42, c
 
 ert. denied,
 
 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004), the Louisiana Supreme Court discussed the admissibility of other crimes evidence categorized as res gestae:
 

 Res gestae
 
 events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them. A close proximity in time and location is required between the charged offense and the other crimes evidence “to insure that ‘the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.’”
 
 State v. Colomb,
 
 98-2813, p. 3 (La.10/1/99), 747 So.2d 1074, 1076 (quoting
 
 State v. Haarala,
 
 398 So.2d 1093, 1098 (La.1981)). The
 
 res gestae
 
 doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances.
 
 State v. Huizar,
 
 414 So.2d 741, 748 (La.1982);
 
 State v. Kimble,
 
 407 So.2d 693, 698 (La.1981). In addition, as this court recently observed, integral act
 
 (res gestae)
 
 evidence in Louisiana incorporates a rule of narrative completeness | ^without which the state’s case would lose its “narrative momentum and cohesiveness, “with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.’ ”
 
 Colomb,
 
 747
 
 *475
 
 So.2d at 1076 (quoting
 
 Old Chief v. United States,
 
 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
 

 In a case similar to the instant one,
 
 State v. Colomb,
 
 98-2813 (La.10/1/99), 747 So.2d 1074, 1075 (per curiam), the Louisiana Supreme Court found that evidence of the defendant’s marijuana possession contemporaneous with the police discovery of the firearm in his truck provided not only narrative completeness to a case which began as a narcotics stop, but also formed an integral part of the context facts in which jurors evaluated the state’s case for the defendant’s exercise of dominion and control over the weapon. The supreme court noted that the State had presented additional opinion testimony from the police that defendant had paraphernalia associated with drug trafficking and that guns and drugs went “hand in hand.” It stated that jurors need not have credited any of that testimony, however, to conclude for themselves that the officers’ disputed testimony about defendant’s spontaneous admission he possessed his wife’s gun for his own protection appeared fully consistent with the undisputed circumstances of the case that the police had stopped the defendant in a high crime area in possession of his own drug stash. The supreme court thought it clear that evidence of defendant’s marijuana possession invited jurors to draw the necessary inferences for their verdict not on the basis of his bad character, otherwise revealed by evidence of his prior convictions for the illegal discharge of a firearm, issuing worthless checks, and receiving stolen property, but on the basis of his contemporaneous conduct and statements accompanying the officers’ discovery of the handgun in his wife’s van.
 

 In the instant case, the narcotics possession was part of a continuing chain of events as the deputy observed the marijuana, counterfeit cocaine, and gun | ^simultaneously in plain view inside defendant’s vehicle. As in
 
 Colomb,
 
 the evidence of defendant’s narcotics possession contemporaneous with the police discovery of the firearm not only provided a narrative completeness to a case which began as a possible narcotics stop, but also formed an integral part of the context facts in which the jurors evaluated the State’s case to determine whether defendant exercised dominion and control over the weapon. With regard to the expert testimony regarding the packaging and sale of drugs and their association with guns, we note that similar testimony was presented at trial in
 
 State v. Colomb,
 
 747 So.2d at 1076.
 

 Based on the foregoing discussion, we find no error in the trial court’s admission of the other crimes evidence or in the admission of the expert testimony. Accordingly, this assigned error is without merit.
 

 ERROR PATENT DISCUSSION
 

 We have also reviewed the record for errors patent in accordance with LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975); and
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals a discrepancy in the commitment and transcript regarding the trial court’s advisal of the prescriptive period for filing post-conviction relief. Although the commitment reflects defendant was properly advised of the prescriptive period for filing post-conviction relief, the transcript reflects an incomplete advisal. The transcript indicates that the trial court advised defendant that he had “two years to seek post-conviction relief.” The failure to advise a defendant that “the prescriptive period runs from the time his
 
 conviction and sentence
 
 become final” is an incomplete advisory.
 
 State v. Grant,
 
 04-341 (La.App. 5 Cir. 10/26/04), 887 So.2d 596, 598. In accord with
 
 State v. Neely,
 
 08-707
 
 *476
 
 (La.App. 5 Cir. 12/16/08), 3 So.3d 532, 538,
 
 writ denied,
 
 09-0248 (La.10/30/09), 21 So.3d 272, and
 
 State v. Davenport,
 
 08-463, (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 451,
 
 writ denied,
 
 09-0158 (La.10/16/09), 19 So.3d 473, we advise defendant by this opinion that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after his judgment of conviction and sentence have become final under the provisions of LSA-C.Cr.P. art. 914 or 922.
 

 Accordingly, for the reasons set forth herein, we affirm defendant’s conviction and sentence.
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 . At trial, the parties stipulated that defendant previously pled guilty to possession of cocaine.
 

 [2]
 

 . At trial, the State and the defense stipulated that the green vegetable matter was submitted for analysis at the crime lab, with the result being that the substance was marijuana. The other substance was apparently counterfeit cocaine and was referred to throughout the trial as "bunk.”