STATE OF LOUISIANA

VERSUS

MICHAEL C. ADAMS AKA "SHAWTY MIKE"

NO. 22-KA-271

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-7075, DIVISION "M"
HONORABLE SHAYNA BEEVERS MORVANT, JUDGE PRESIDING


May 10, 2023


**CORNELIUS E. REGAN**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Jude G. Gravois, and Cornelius E. Regan, Pro Tempore


**<u>CONVICTIONS AFFIRMED; SENTENCES</u>**
**<u>ON COUNTS TWO AND THREE VACATED</u>**
**<u>AND REMANDED FOR RESENTENCING</u>**
 **CER**
 **FHW**
 **JGG**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

*Alexis Barteet*
Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA

 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Anne M. Wallis
 Zachary P. Popovich
 Lindsay L. Truhe

COUNSEL FOR DEFENDANT/APPELLANT,
MICHAEL C. ADAMS AKA SHAWTY MIKE

 Jane L. Beebe

**REGAN, J.**

In this appeal, defendant, Michael C. Adams a/k/a "Shawty Mike," challenges his convictions and sentences for second degree murder, conspiracy to commit a robbery while armed with a dangerous weapon, and possession of a firearm by a convicted felon. For the reasons stated below, we affirm defendant's convictions, vacate defendant's sentences as to Counts 2 and 3, and remand for resentencing.

**PROCEDURAL BACKGROUND**

On March 23, 2017, a Jefferson Parish Grand Jury indicted defendant with the second degree murder of Alfred Hill, Jr. by discharging a firearm in violation of La. R.S. 14:30.1 (count one), conspiracy to rob Alfred Hill, Jr. while armed with a firearm in violation of La. R.S. 14:26 and La. R.S. 14:64 (count two), and possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count three).[1] Defendant was arraigned on March 24, 2017, and pled not guilty to all charges.

On April 3, 2017, defendant filed a *pro se* motion to suppress evidence. Defense counsel also filed omnibus motions, including a motion to suppress the statement, evidence, and identification, on April 10, 2017. On June 25, 2018, the trial court held an evidentiary hearing on defendant's motions to suppress; however, the trial court left the hearing open until July 30, 2018 to allow for the introduction of additional evidence. After the conclusion of the hearing on July 30, 2018, the trial court allowed the State and defendant to submit memoranda. On September 13, 2018, the trial court denied all of defendant's motions.[2]

---

[1] In that same indictment, the State charged co-defendants/co-conspirators, Charles Johnson and Jerryco Johnson, with counts one and two. The State also alleged with respect to count three, that defendant violated La. R.S. 14:95.1 by possessing a firearm after defendant was previously convicted of two counts of armed robbery in Case No. 03-5835 and four counts of aggravated assault with a firearm in Case No. 03-5836, both on November 5, 2003 in the Twenty Fourth Judicial District Court.

[2] Defendant filed a writ application with this Court challenging the denial of his motions to suppress evidence. On January 25, 2019, this Court denied the writ finding that it did not have the required

On September 24, 2018, the State filed a Motion for Pre-Trial Ruling on Co-Conspirator Statements contained in Charles and Jerryco Johnson's Instagram posts. On March 20, 2019, the State also filed a Notice of Intent to Introduce Certified Records of Regularly Conducted Business Activity, which sought approval to introduce Instagram records for the subscriber account, "lb_maxx." The evidence presented at trial established that this subscriber account belonged to Jerryco Johnson. On March 25, 2019, the trial court granted the State's motion to admit these Instagram posts into evidence.[3]

On July 26, 2019, the State filed a Notice of Intent to Introduce Evidence of Similar Crimes, Wrongs, and/or Acts Pursuant to Louisiana Code of Evidence Article 404(B)/Res Gestae Evidence. In that notice, the State sought to introduce evidence that defendant possessed ten ecstasy pills at the time of his arrest. On September 9, 2019, the trial court granted the State's 404(B) motion after a hearing.

On September 10, 2019, the case proceeded to trial; however, on September 12, 2019, the trial court declared a mistrial. On January 24, 2022, the trial court adopted all of its prior rulings in the matter and the case proceeded to trial again before a twelve-person jury.[4] On January 28, 2022, the jury unanimously found defendant guilty as charged on all three counts. Defendant filed a motion for new trial on the same day, and on February 7, 2022, the trial court denied the motion. Defense counsel then declared defendant ready for sentencing, and on that same

---

documents to review the ruling. This Court further declared that "[i]n the event of a conviction, relator may seek review of the trial court's rulings on appeal." *State v. Adams*, 18-K-720 (La. App. 5 Cir. 1/25/19) (unpublished writ disposition).

[3] Defendant filed a writ application with this Court challenging the trial court's ruling, and on May 30, 2019, this Court denied the writ on the showing made because defendant did not provide a transcript. This Court further declared that defendant had an adequate remedy on appeal in the event of a conviction. *State v. Adams*, 19-K-198 (La. App. 5 Cir. 5/30/19) (unpublished writ disposition).

[4] Trial proceedings were delayed because the trial court found defendant incompetent to proceed to trial on October 14, 2020. After a subsequent competency hearing on May 19, 2021, the trial court determined that defendant's competency was restored.

day, the trial court sentenced defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence on count one; imprisonment for 50 years on count two; and imprisonment for 20 years without the benefit of parole, probation, or suspension of sentence on count three.

As to the consecutive and concurrent nature of these sentences, the transcript is unclear as to the trial court's intent. The transcript reflects that the trial court stated, "Count two, conspiracy to commit armed robbery, the Court in considering the prior convictions being of a similar nature concerned over another crime of violence, the Court hereby sentences you to 50 years to run consecutive to any and all other sentences on count two…With respect to count three, convicted felon with a firearm and possession of a firearm, the Court sentences you to 20 years without benefit. That's to run concurrent with counts one and two."[5] Defendant objected to the sentences and the imposition of a consecutive sentence.

Also on February 7, 2022, defendant orally moved for an appeal, and filed a written motion for appeal. The trial court granted the motions for appeal on that same date. On February 10, 2022, defendant filed a motion for reconsideration of his sentences, which the trial court denied on February 22, 2022, after a hearing.

## THE EVIDENCE

This case involves the killing of Alfred Hill, Jr. who was with his girlfriend, Gajan Reed, just prior to the incident. In sum, the evidence showed that on the morning of November 18, 2016, Mr. Hill and Ms. Reed traveled in Mr. Hill's truck to the 4200 block of Lac Couture Drive in Harvey to meet someone. Ms. Reed did not know the name of the person Mr. Hill was meeting. Phone calls were exchanged between Mr. Hill and a person using a phone later identified as defendant's cell phone directing Mr. Hill to the location. Once they arrived, a man

---

[5] *See* discussion, *infra*, regarding the trial court's imposition of indeterminate sentences with respect to their concurrent and consecutive nature.

whom Ms. Reed later identified as defendant, held a gun to Mr. Hill's head, rummaged through Mr. Hill's pockets, and then shot him to death. Ms. Reed testified that two other men appeared at the scene during the incident whom she later identified as Charles Johnson and Jerryco Johnson. Ms. Reed further testified that the men subsequently fled the scene in a tan-colored SUV, later identified as a Nissan Xterra that was registered to Shantrice Copeland (Jerryco Johnson's girlfriend). Evidence collected at the scene included two fired 9 mm cartridge cases and a cigarette (later found to contain defendant's DNA).

With respect to the conspiracy to commit armed robbery charge, Sergeant Solomon Burke testified regarding text messages between defendant and Jerryco Johnson prior to the shooting indicating their intent to rob Mr. Hill. Detective Joseph Waguespack testified regarding Instagram messages between Jerryco and Charles Johnson after the murder implicating defendant. Additionally, the State and the defense stipulated to defendant's prior convictions in connection with the possession of a firearm by a convicted felon charge. Defendant did not call any witnesses.

Ms. Reed testified that on the morning of November 18, 2016, Mr. Hill received a phone call. Ms. Reed recalled that Mr. Hill told her he had to go help a friend who said he was "locked out." They traveled in Mr. Hill's truck to a residential area. After they arrived, Mr. Hill spoke to the individual again and he told the individual that he was in the front and could not see him. The individual then told Mr. Hill to come to the back. Ms. Reed testified that she was able to hear the call because it was on the speaker.

Ms. Reed testified that they rode to the back of the residential area, pulled up next to a white car, and parked. She stated that an African-American man was leaning against the white car with a pack of "Buglers," or rolled-up cigarettes, in his hand. Ms. Reed asserted that she was in the passenger seat and that the white

car was on her right. She explained that the man then walked behind their truck to Mr. Hill's side. Ms. Reed testified that Mr. Hill exited the truck and that he and the man talked near the rear of the truck. Ms. Reed thought she recognized the man's voice, so she put the visor down and looked in the mirror. She determined that she did not recognize the man.

Ms. Reed testified that she was looking at her phone, when the driver-side door opened. She raised her head and saw the man with a gun in his right hand holding it to Mr. Hill's temple and his left hand on Mr. Hill's shoulder. She stated that she was again able to see the face of the man who was holding the gun. Ms. Reed testified that the man told her to put her phone down and get out of the truck or that he would "put two in his dome." She put the phone down, exited the truck, shut the door, and looked under the truck. Ms. Reed explained that Mr. Hill was on his stomach at that time. The man still had the gun at Mr. Hill's head and was going through Mr. Hill's pockets.

Ms. Reed further provided that when she lifted her head, she bumped into another man, who said, "Oh, I just asked him for a cigarette. I don't know what's going on, but I'm strapped." Ms. Reed testified that she walked away from the scene and the second man followed her. She also stated that this individual "flashed" a gun at her. Ms. Reed then recalled that as they were walking, a third man came out from a walkway or "trench way" and stated, "Man, dude tripping. I just asked for a cigarette." Ms. Reed asserted that these two men then walked to a tan SUV and waited on each side of it.

Ms. Reed stated that one of the men then said he did not hear any shots so she might be okay, after which she heard two gunshots. Ms. Reed testified that she then ran towards Mr. Hill's truck, but she stopped when she saw the shooter

running towards her with a gun and her black bag with a strap across his chest.[6] Ms. Reed indicated that she ran in the other direction, and then saw the second man and third man get into the tan SUV and leave the scene. Ms. Reed maintained that she did not see the gunman get into the SUV, but the gunman was not there after the tan SUV left the scene. Ms. Reed testified that she subsequently looked for assistance and eventually found a man who was cutting grass and asked him to call the police.

Ms. Wynne Petit testified that in November 2016, she lived in an apartment at 4165 Lac Couture Drive. On November 18, 2016, at approximately 8:00 or 9:00 a.m., she went outside where she saw two young adult men standing in front of her building. Approximately two hours later, the two men were still there. Ms. Petit provided that at some point, she saw a vehicle that was "almost like a Xterra" that was a beige/bronze-type color. She explained that both men got into the vehicle and left along with a third person she observed in the vehicle. Ms. Petit recalled that approximately five minutes later, she and her neighbor saw the men coming back. Ms. Petit went inside because she thought something was not right. She testified that her neighbor called and told her not to go outside as the men had a gun to a young man's head. Ms. Petit said that she then heard a "pop," after which her neighbor said that they killed the young man. She waited awhile and then went outside where she saw the victim lying face down. Ms. Petit explained that she saw a decal on the victim's vehicle, so she dialed the number but then ended the call when detectives arrived at the scene.

Jefferson Parish Sheriff's Office (JPSO) Sergeant Travis Eserman testified that he responded to a call regarding the shooting. When he arrived at the scene,

---

[6] Ms. Reed stated that she left her black bag in the back seat of Mr. Hill's truck. Detective Waguespack testified that Ms. Reed told him that a bag was removed from the truck, and she could not remember if her bag or the victim's bag had a strap. According to Detective Waguespack, they did not locate Ms. Reed's bag and the bag containing narcotics seized at the time of defendant's arrest did not match the description of Ms. Reed's bag.

the victim was dead.[7]  Sergeant Eserman stated that the victim's pockets were turned inside out.  JPSO Homicide Detective Joseph Waguespack was the lead investigator and also responded to the scene.  He explained that the victim was lying face down next to the open driver-side door.  Detective Waguespack testified that there were two 9 mm spent bullet casings on the ground near the body, as well as a partially smoked hand-rolled cigarette, which were collected from the scene.

Former JPSO Detective Donald Zanotelli testified that he was retired at the time of the trial.  At the time of the murder, Detective Zanotelli was assigned to the homicide division.  He explained that on November 18, 2016, he went to the crime scene and spoke to Ms. Reed, who gave a narrative of what happened prior to the shooting.  He explained that they obtained video surveillance from a location near the crime scene that captured the events leading up to the murder.  Detective Zanotelli identified Ms. Reed in the video, and further testified that the video showed an individual walking in the same direction as Ms. Reed and a third individual entering the camera screen near Ms. Reed.  He pointed out an Xterra fleeing the scene later in the video.  Detective Zanotelli testified that everything seen in the video was consistent with what Ms. Reed told him.

Detective Zanotelli also testified that he obtained cell phone records for the victim's phone and defendant's phone based on an exigent request.[8]  He explained that he made this request to identify the individual communicating with the victim before the shooting, as well as the location of the phones.  Detective Zanotelli noted that the 9-1-1 call regarding the shooting came in at 11:46 a.m.  He further

---

[7] Dr. Susan Garcia testified that in 2016, she was the chief forensic pathologist for the Jefferson Parish Coroner's Office.  The trial court accepted her as an expert in the field of forensic pathology.  Dr. Garcia testified that the cause of defendant's death was homicide due to two gunshot wounds to the back of the head.

[8] Detective Zanotelli explained that cell phone providers grant requests from law enforcement for information about the location of a phone or subscriber information without a search warrant when exigent circumstances exist.

22-KA-271                                    7

stated that the phone records showed that a "377" number called the victim at 10:43 a.m., 10:44 a.m., and all the way up until 11:30 a.m.

Detective Zanotelli explained that based on the information he obtained from the victim's phone, he also requested and obtained information about the "377" number based on exigent circumstances. The response he received from the phone company indicated that the "377" number was registered to defendant. He explained that two calls placed prior to the murder at 11:19 a.m. and 11:30 a.m. were made from defendant's phone to the victim's phone and hit the same tower approximately one mile away from the murder scene. Detective Zanotelli further explained that they compiled a lineup with defendant's picture and showed it to Ms. Reed, who positively identified number five, defendant, as the shooter.

Detective Zanotelli also testified at trial that they used the Automated License Plate Reader (ALPR) camera system to try to locate the Xterra. Using the ALPR, they determined that on the date of the incident, November 18, 2016, the Xterra was near the murder scene both before and after the murder. He stated that they also spoke to defendant's girlfriend, Octavia Johnson, who directed them to Jerryco Johnson (her brother) and Shantrice Copeland (Jerryco's girlfriend) with respect to the Xterra. Detective Zanotelli determined the Xterra was registered to Ms. Copeland.

Ms. Copeland testified that she drove a tan Nissan Xterra and that Jerryco Johnson was her baby's father. She explained that they were dating off and on in November 2016. Ms. Copeland further testified that on November 18, 2016, she was working as an operating room assistant at Ochsner Hospital on Jefferson Highway and that she was not in that vehicle in Harvey on the day of the murder. She stated that the only other person who had access to the Xterra was Jerryco Johnson.

Detective Zanotelli testified that he also learned that Jerryco Johnson was using Ms. Copeland's phone (referred to as the "300" number) on the day of the murder. Detective Zanotelli explained that they obtained phone records for the "300" number and learned that phone was pinging on the same tower a mile away from the murder scene as defendant's phone. He also stated that they showed a photographic lineup to Ms. Reed and that she positively identified number five, Jerryco Johnson, as the second man involved in the incident.

Bryan Polson testified at trial that he was formerly employed by the Department of Probation and Parole for the State of Louisiana. He explained that in November 2016, he was defendant's probation officer for an armed robbery conviction following defendant's release on parole on September 20, 2015. Sometime after his release, the Department obtained a warrant for defendant's arrest due to his failure to report to his parole officer. Mr. Polson further testified that on November 23, 2016, he participated in defendant's arrest after learning from the JPSO that defendant was a person of interest in a homicide case. Mr. Polson recalled going to 412 Park Boulevard in Algiers to assist with defendant's arrest. He testified that a black canvas bag was located in the kitchen area and that defendant's uncle identified it as defendant's property. Mr. Polson further testified that he searched the bag and found what "later tested positive to be Ecstasy." He stated that he also found defendant's wallet with his social security card and picture ID along with items of clothing in that bag.

David Cox testified that he was employed with the JPSO as the DNA technical leader. The trial court accepted him as an expert in the field of DNA analysis. Mr. Cox explained to the jury that his office compared DNA taken from certain evidence samples with reference samples from the victim and defendant. He testified that the DNA profile obtained from the cutting of a cigarette butt retrieved from the scene of the murder was consistent with the profile of defendant.

Mr. Cox provided that the probability of finding the same DNA profile, if the DNA had come from a randomly selected individual other than Michael Adams, was one in greater than 100,000,000,000. He stated that the victim was excluded as a contributor of DNA in that sample.

Sergeant Solomon Burke testified that he was the commander of the Digital Forensics Unit. The trial court accepted him as an expert in the field of mobile device forensics. Sergeant Burke testified that they extracted digital evidence from defendant's phone. He stated that there were a series of text messages from the "377" number (defendant's phone) to the "300" number (Ms. Copeland's phone used by Jerryco). He noted that the "300" number was saved in the phone as "Broco." The outgoing message from "377" was, "Bro, this Mike." Another outgoing message sent on November 18, 2016, at 8:54 a.m., was, "412 Park Boulevard, Algiers. I'm ready." Sergeant Burke testified that there was an incoming message from a phone number ending in 4766 (victim's phone) that stated, "Five miles. Ten minutes away." He stated that the outgoing message to Broco was, "Bro, his girl with him. I ain't killed no girl before." He said that the very next incoming message was from Broco stating, "Just jack him."

Detective Waguespack also testified that he obtained Jerryco's Instagram messages. Detective Waguespack explained that on November 20, 2016, Jerryco had an Instagram conversation with someone during which he confessed that he and two other individuals robbed someone of Ecstasy and money and then killed him. He also explained that on December 1, 2016, Jerryco had an Instagram conversation with Charles Johnson, wherein they implicated defendant in the murder and discussed hiding the murder weapon.

The State and defendant also stipulated at trial that defendant had two prior convictions in the Twenty Fourth Judicial District Court for Jefferson Parish. The first conviction was in Case No. 03-5835, where defendant pled guilty on

November 5, 2003, to two counts of armed robbery and received a fifteen-year sentence. The second conviction was in Case No. 03-5836, where defendant pled guilty on that same date to four counts of aggravated assault on a police officer with a 9 mm firearm and received a ten-year sentence.

## LAW AND DISCUSSION

### Motion to Suppress Evidence Arising from Exigency Requests

In his first assignment of error, defendant argues that the trial court erred in denying his motion to suppress the evidence. He argues that after the police arrived at the scene, Detective Zanotelli immediately made an exigency request pursuant to the Stored Communications Act for the victim's cell phone records.[9] He then used the information obtained from that request to make additional exigency requests to Sprint and other providers for phone records and locations of other phones, including defendant's phone. Defendant argues that these exigency requests were without legal cause such that the evidence obtained by means of these requests should have been suppressed and should not have been admitted at trial. In support of his position, defendant cites to *Carpenter v. Unites States*, -- U.S. -- , 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018), which he states requires a search warrant supported by probable cause before cell phone location records can be acquired from a third-party provider. Defendant further argues that the exigency requests at issue do not meet the exigent circumstances exception recognized by the United States Supreme Court in *Carpenter*.

The State responds that the United States Supreme Court issued its ruling in *Carpenter* in June 2018, well after the November 2016 offense and the exigency requests made in the instant case. The State argues that the law in effect at the

---

[9] 18 U.S.C. § 2702(c)(4) of the Stored Communications Act provides that cell phone service providers may disclose, without a warrant, "a record or other information pertaining to a subscriber to or customer of [cell phone] service ... to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency."

time of the offense governs, and therefore, the good faith exception to the exclusionary rule established in *Davis v. United States*, 564 U.S. 229, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), applies. It contends that under *Davis*, when the police conduct a search in accordance with legal precedent binding at the time of the search, the fruits of the search are not subject to suppression under the exclusionary rule, even if the legal precedent is later overturned.

The State further argues that even if *Carpenter* is retroactive to the instant case because it is not yet final, *Carpenter* provides that one of the exceptions to the warrant requirement is when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable. The State asserts that the *Carpenter* court found such exigencies to include the need to pursue a fleeing suspect, to protect individuals who are threatened with imminent harm, or to prevent the destruction of evidence. The State argues that there were exigent circumstances in the instant case, which included that the perpetrator was dangerous, armed, and fleeing into the public at large, along with the risk of evidence destruction. The State also argues that parolees, such as defendant, have a reduced expectation of privacy. Therefore, the State maintains that the motion to suppress the evidence was properly denied.

In a hearing on a motion to suppress, the State bears the burden of proof in establishing the admissibility of evidence seized without a warrant. La. C.Cr.P. art. 703(D). A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. *State v. Rogers*, 09-13 (La. App. 5 Cir. 6/23/09), 19 So.3d 487, 493, *writ denied*, 09-1688 (La. 4/9/10), 31 So.3d 382. In determining whether the trial court's ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing but also may consider pertinent

evidence presented at trial. *State v. Sam*, 11-469 (La. App. 5 Cir. 2/14/12), 88 So.3d 580, 586, *writ denied*, 12-631 (La. 9/12/12), 98 So.3d 301.

In *Carpenter*, *supra*, the United States Supreme Court addressed the question of whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements. The Supreme Court held that the Government's acquisition of the cell site records in that case was a search within the meaning of the Fourth Amendment and that the Government must generally obtain a warrant supported by probable cause before acquiring such records. *Carpenter*, 138 S.Ct. at 2221. In *State v. Davis*, 18-485 (La. App. 5 Cir. 4/10/19), 269 So.3d 1123, *writ denied*, 19-716 (La. 11/12/19), 282 So.3d 229, this Court found that although *Carpenter* was decided subsequent to the defendant's conviction and sentence, the United States Supreme Court has instructed that a new rule for the conduct of a criminal prosecution must be applied retroactively to all cases, state or federal, pending on direct review or not yet final, *citing Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). Therefore, the *Davis* court found that the *Carpenter* holding applied retroactively to the defendant's case since it was currently pending on direct review with this Court. *Davis*, 269 So.3d at 1134.

In *Carpenter*, however, the Supreme Court also recognized that even though the Government will generally need a warrant to access cell site location information, case-specific exceptions may support a warrantless search of an individual's cell site records under certain exigent circumstances. It stated that "[o]ne well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Carpenter*, 138 S.Ct. at 2222-23. The Supreme Court found that such exigencies included the need to

pursue a fleeing suspect, protect individuals who are threatened with imminent harm, or prevent the imminent destruction of evidence. It observed that if law enforcement is confronted with an urgent situation, such fact-specific threats will likely justify the warrantless collection of cell site location information. The Supreme Court pointed out that its decision did not call into doubt warrantless access to cell site location information in such circumstances. It found that while police must get a warrant when collecting cell site location information to assist in the "mine-run" criminal investigation, the rule it set forth does not limit their ability to respond to an ongoing emergency. *Carpenter*, 138 S.Ct. at 2223.

Though decided prior to *Carpenter*, in *State v. Isaac*, 17-87 (La. App. 5 Cir. 10/25/17), 229 So.3d 1030, 1040, *writ denied*, 17-2106 (La. 6/15/18), 257 So.3d 679, this Court analyzed when exigent circumstances exist:

> Exigent circumstances have been described as an "emergency or dangerous situation" and as circumstances "in which police action literally must be 'now or never' to preserve the evidence of the crime." *Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980); *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2802, 37 L.Ed.2d 757 (1973). Exigent circumstances may arise from the need to prevent the offender's escape, to minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and to preserve evidence from destruction or concealment. *State v. Brisban*, 00-3437 (La. 2/26/02); 809 So.2d 923. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967); *Riley v. California*, —— U.S. ——, 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014).

In the instant case, Detectives Waguespack and Zanotelli explained at the hearing on the motion to suppress, as well as at trial, that they made the exigent requests to cell phone providers because the victim's phone was no longer at the crime scene and Ms. Reed informed them that the victim was in contact with the person they were meeting just prior to his murder. Ms. Reed further informed them that the perpetrator fled the scene with the gun and a bag taken from the

victim's truck. Detective Zanotelli testified that he made the exigent circumstances request to the provider due to the nature of the homicide and the information they gathered indicating that the matter involved "a robbery gone bad." Detective Waguespack testified that at that time they knew the person who committed the murder and fled the scene with a gun could pose a danger to the public and law enforcement.

Based on the foregoing, we find that exigent circumstances existed to supported the warrantless search of the cell site records. At the time officers made the exigent requests, Mr. Hill was the victim of an armed robbery and had been shot twice in the head and killed. The perpetrator was armed and dangerous and had fled the scene with a gun and two other men. They left behind an eyewitness who had seen their faces. We find that the police needed the information obtained through the exigent requests to pursue the fleeing suspects, protect the public from these men, and prevent the destruction of evidence of the armed robbery and murder of Mr. Hill. Also, the use of the real-time GPS location of defendant's cell phone was no more expansive than necessary to address the exigency that existed. Detective Zanotelli testified that the exigent request was only valid for forty-eight hours, after which he obtained a search warrant.

In addition, we find that the trial court did not err in denying defendant's motion to suppress the evidence because officers acted in objectively reasonable reliance on a statute, the Stored Communications Act, 18 U.S.C. § 2703, which lawfully authorized the warrantless search of defendant's cell phone location and records at the time. In this Court's recent decision, *Davis*, *supra,* the defendant argued that the State violated his Fourth Amendment right to privacy when it introduced his cell phone records, which included cell site location information, at trial. Similar to the present matter, the defendant contended that officers obtained the evidence in contravention of *Carpenter*, because they utilized a request through

the Stored Communications Act, rather than obtaining a search warrant. This Court found that the defendant did not properly preserve this issue for review on appeal because he did not object to the failure to rule on his motion to suppress. Nevertheless, this Court found that even if considered, the exclusion of the evidence was not warranted. *Id.* at 1134.

This Court recognized that the exclusionary rule "is designed to deter police misconduct rather than to punish the errors of judges and magistrates," *citing United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). This Court also discussed *Davis v. United States*, *supra*, noting that the United States Supreme Court had held that evidence obtained during a search conducted in objectively reasonable reliance on binding appellate precedent, which was subsequently overruled, was not subject to the exclusionary rule. *Davis*, 269 So.3d 1134-35. This Court observed that in obtaining the evidence, officers acted in accordance with the Stored Communications Act and established Louisiana jurisprudence prior to *Carpenter's* holding, citing *Isaac*, 229 So.3d at 1038-43. Accordingly, this Court found that exclusion of the evidence would not have been warranted under the facts of the case. *Davis*, 269 So.3d 1135.

In *Isaac*, *supra*, this Court also found that the police had a good faith, reasonable belief that applicable law authorized the obtaining of the defendant's cell phone records under similar circumstances. The *Isaac* court pointed out that in *Illinois v. Krull*, 480 U.S. 340, 342, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Supreme Court concluded "that the Fourth Amendment exclusionary rule does not apply to evidence obtained by police officers who acted in objectively reasonable reliance upon a search warrant issued by a neutral magistrate, but where the warrant was ultimately found to be unsupported by probable cause," should be extended to instances in which "officers act in objectively reasonable reliance upon a statute authorizing warrantless administrative searches, but where the statute is

ultimately found to violate the Fourth Amendment." Accordingly, this Court found that the trial court properly denied the motion to suppress based on exigent circumstances, the Stored Communications Act, and the officers' reasonable good faith reliance on applicable law. *Id.* at 1041-42.

Accordingly, we further find that the evidence need not be suppressed based on the good faith exception to the warrant requirement. The police officers in the instant case acted in objectively reasonable reliance upon a statute authorizing the warrantless search of cell site location records that was lawful at the time of the warrantless search but later found to violate the Fourth Amendment.

**<u>Other Crimes Evidence</u>**

In his second assignment of error, defendant argues that the trial court erred by granting the State's motion to introduce other crimes evidence, namely, evidence that he was in possession of ecstasy pills at the time of his arrest. He contends that the ecstasy pills were not identified by Ms. Reed nor any State witness as belonging to Mr. Hill and that there was no testimony or evidence that Mr. Hill's fingerprints or DNA were on the bag. He contends that the evidence was introduced solely to portray him as a bad person.

Defendant also argues that the trial court erred by admitting into evidence Instagram messages between the alleged co-conspirators that were sent after the shooting. He asserts that the Instagram messages between the co-defendants, who were severed for trial, were erroneously admitted because he had no way to cross-examine or confront his accusers about what they had written, presumably about him. Defendant argues that these errors were not harmless because the verdicts were not solely unattributable to the errors.

The State responds that the trial court did not err by granting its motion to introduce other crimes evidence. It further responds that in the Instagram messages, defendant was implicated as robbing the victim of his ecstasy pills. The

State argues that defendant having ecstasy in his possession during his arrest for murder was probative and relevant because it helped to establish defendant's motive, identity, and intent for robbing and killing the victim. It also argues that without reference to the ecstasy pills seized during defendant's arrest, the jury would have been deprived of corroborating evidence of defendant's identity as the gunman. It further argues that the ecstasy pills were admissible under the *res gestae* doctrine because it formed an integral part of the investigation and the events leading up to defendant's arrest. The State additionally responds that even if the admission of evidence that defendant possessed ecstasy pills at the time of his arrest was improper, any error was harmless since it presented sufficient evidence of defendant's guilt without that evidence.

*Co-Conspirator Statements*

As explained earlier, on September 24, 2018, the State filed a Motion for Pre-Trial Ruling on Co-Conspirator Statements. In that motion, the State sought to have certain statements made by defendant's co-conspirators admitted against him at trial. The State alleged that conversations found on Jerryco's Instagram account pursuant to a warrant showed that Jerryco, Charles, and defendant committed the murder and that Jerryco and Charles planned to dispose of the murder weapon in furtherance of their conspiracy.

More specifically, the State alleged that a November 20, 2016 conversation was admissible as a non-testimonial statement against penal interest if Jerryco invoked his Fifth Amendment right, and the court declared him unavailable. The State alleged that a December 1, 2016 conversation was admissible as a statement made by a co-defendant in furtherance of a conspiracy and that neither statement was testimonial in nature to invoke the confrontation clause. Attached to the State's motion was the police report and copies of these Instagram statements. On March 20, 2019, the State also filed State's Notice of Intent to Introduce Certified

Records of Regularly Conducted Business Activity, namely, Instagram records associated with subscriber Ib_maxx, identified as Jerryco Johnson.

On December 13, 2018, defendant filed a Memorandum in Opposition to Admission of Charged Co-Defendants' Statements at Trial, arguing that the evidence should not be admitted because a *prima facie* case of conspiracy had not been established and the admission of the statements would violate his confrontation rights. Following a hearing on March 25, 2019, the trial court granted the State's request to introduce the Instagram records containing the co-conspirator statements.

At trial, Detective Waguespack testified that during his investigation, he obtained a search warrant to retrieve Jerryco's Instagram messages. When Detective Waguespack received those messages, he noticed two important conversations. Detective Waguespack testified that on November 20, 2016, at 3:36 p.m., Jerryco had an Instagram communication with someone called "Pullup Killa." Jerryco said, "Boy," N-word "f*cked up a" N-word "up in the back."' The detective explained that the area where the murder occurred was referred to as "The back of the Lacs." The response to Jerryco was, "Who." Jerryco answered, "Me, blank and blank," which indicated to the detective that three individuals were involved. The other person responded, "Who y'all f*cked up?" Jerryco replied, "IDK. Some" N-word. "We jacked him and hit him." Detective Waguespack testified that "IDK" meant I don't know; that "jacked" meant robbed; and that "hit" meant killed. The person responded, "Out what?," and the reply was "Them X." Detective Waguespack stated that "X" was ecstasy, noting that defendant was found with ecstasy when he was arrested.

Detective Waguespack testified that Jerryco stated in the Instagram message, "Yeah and money. We could not find a hammer in the car." The detective stated that a "hammer" was a gun. The person responded, "Oh, when was that?" Jerryco

replied, "The other day." The detective pointed out that this message was two days after the murder. The other person stated, "You stunting," which the detective said meant lying. Jerryco responded, "Okay. Look on NOLA." Detective Waguespack stated that two days after the murder, an article about the murder was in the media.

Detective Waguespack also testified about another Instagram communication between Jerryco and Charles. He said that on December 1, 2016, Charles messaged, "I found the ladder for the M and P," with a picture. Detective Waguespack testified that "ladder" meant an extended magazine. He explained that an extended magazine could increase the round capacity of a firearm and that it went with a Smith and Wesson M and P Shield, which he stated was a 9 mm. Detective Waguespack pointed out that the victim was killed with a 9 mm. He said that Jerryco responded, "That boy found that b*tch. I told you I seen one." Charles replied, "I'm going to keep that b*tch now. Just keep it ducked off by Tavi's House." Jerryco messaged, "You tripping, goon. I don't even want goon with that b*tch." Detective Waguespack testified that "ducked off" meant hidden.

Detective Waguespack further testified that Charles responded, "Anybody else can have it and say the N-word sold it to them, but by Tavi being our sister they're going to know N-word got it from Shawty Mike." The detective explained that "Tavi" was Octavia's nickname and that "Shawty Mike" was defendant's nickname. He said that Charles replied, "Or let him use it," and that Jerryco stated, "Well, I ain't f*cking with it. That's on y'all boys." Detective Waguespack testified that after reviewing these conversations, he obtained an arrest warrant charging Jerryco with murder.

On appeal, defendant argues that the Instagram messages between the co-defendants, who were severed for trial, were erroneously admitted because he had

no way to cross-examine or confront his accusers about what they had written, presumably about him.

The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. *State v. Jackson*, 03-883 (La. App. 5 Cir. 4/27/04), 880 So.2d 841, 852, *writ denied*, 04-1399 (La. 11/8/04), 885 So.2d 1118. In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court restricted the admissibility of testimonial statements as evidence at a criminal trial in situations when the declarant is unavailable to testify, and the defendant has had a prior opportunity to cross-examine the declarant.

The *Crawford* Court, however, determined that for a statement to be "testimonial," the statement at a minimum must include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial[,] and police interrogations." *State v. Leonard*, 05-42 (La. App. 5 Cir. 7/26/05), 910 So.2d 977, 989, *writ denied*, 06-2241 (La. 6/1/07), 957 So.2d 165. The *Crawford* Court stated that "testimony" is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Leonard, supra* (citing *Crawford*, 124 S.Ct. at 1364).

The Sixth Amendment bestows a right of confrontation to confront witnesses who "bear testimony" against him; according to the Supreme Court, an accuser making a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not. *Leonard, supra*. As examples of testimonial statements, the *Crawford* Court lists affidavits, custodial examinations, depositions, prior testimony, confessions, or similar pretrial statements that declarants would reasonably expect to be used in a prosecution. The *Crawford* Court also refers to statements as testimonial that were made under circumstances that would lead an objective witness reasonably to

believe that the statement would be available for use at a later trial. *Leonard*, 910 So.2d at 989-90 (citing *Crawford*, *supra*).

No Louisiana court has addressed the exact issue of whether Instagram messages are testimonial or non-testimonial under *Crawford*. However, this Court has found that text messages are non-testimonial. In *State v. Lang*, 13-21 (La. App. 5 Cir. 10/9/13), 128 So.3d 330, *writ denied*, 13-2614 (La. 5/2/14), 138 So.3d 1244, the defendant argued that the trial court erred in denying her motion to exclude certain evidence under the confrontation clause. The defendant further argued that her right to confront her accusers was violated when texts from and between co-conspirators were admitted into evidence at trial, even though those individuals and others mentioned in the texts did not testify at trial. *Id.* at 336.

In *Lang*, this Court found that the text messages were not testimonial under *Crawford* and did not violate the defendant's right of confrontation. It further found that the statements contained within the text messages were made in casual, private conversations and did not come within the purview of any of the classes of testimonial statements mentioned in *Crawford*. Additionally, this Court found that the defendant and her co-conspirators had no expectation that their statements would be of later use to help establish that the defendant committed a crime, as they spoke informally and without coercion. *Id.* at 340.

In the instant case, we find that the Instagram statements between Jerryco Johnson and another individual, and between Jerryco and Charles Johnson, were non-testimonial and would not violate defendant's right to confrontation. The Instagram conversations were both casual and private. Jerryco, Charles, and the other individual spoke informally and without coercion, and therefore, their statements did not come within the purview of any of the classes of testimonial statements mentioned in *Crawford*. As such, we find that the trial court did not abuse its discretion by the admission of these Instagram statements.

*Evidence that Defendant Possessed Ecstasy Pills When Arrested*

On July 26, 2019, the State filed State's Notice of Intent to Introduce Evidence of Similar Crimes, Wrongs, and/or Acts Pursuant to Louisiana Code of Evidence Article 404(B)/Res Gestae Evidence. In that notice, the State sought to introduce into evidence that defendant possessed ten ecstasy pills at the time of his arrest. On September 9, 2019, defendant filed an opposition to the State's 404(B) Notice arguing that the allegation that defendant possessed ecstasy pills at the time of his arrest was not related to the murder. He also contended that these acts do not have any independent relevance and that their sole purpose is to introduce bad character evidence to show conformity therewith. He finally argued that the probative value is substantially outweighed by the prejudicial effect. Following a hearing on September 9, 2019, the trial court granted the State's 404(B) motion, stating that it would be appropriate for the State to bring that information in as *res gestae*.

Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1); *State v. Prieur*, 277 So.2d 126, 128 (La. 1973). However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. *State v. Williams*, 10-51 (La. App. 5 Cir. 7/27/10), 47 So.3d 467, 474, *writ denied*, 10-2083 (La. 2/18/11), 57 So.3d 330. Evidence of other crimes is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad acts. La. C.E. art. 404(B)(1); *State v. Lawson*, 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 525.

In order for other crimes evidence to be admitted under La. C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. *Lawson*, 1 So.3d at 525-26. Moreover, the probative value of the extraneous evidence must outweigh the prejudicial effect. La. C.E. art. 403.

Evidence that constitutes an integral part of the crime, formerly known as "*res gestae*," is admissible without any prior notice to the defense. *State v. Charles*, 00-1586 (La. App. 5 Cir. 6/27/01), 790 So.2d 705, 708. A close connexity between the charged and uncharged conduct is required to ensure that "the purpose served by admission of the other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *Id.* (citing *State v. Colomb*, 98-2813 (La. 10/1/99), 747 So.2d 1074, 1076).

The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 187, *writ denied*, 12-282 (La. 5/18/12), 89 So.3d 1191, *cert. denied*, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013). Clearly, evidence of other crimes or bad acts is prejudicial since all evidence that tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. The underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime. *State v. Williams*, 02-645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, *writ denied*, 02-3182 (La. 4/25/03), 842 So.2d 398. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art. 404(B)(1) will not be disturbed. *State v. Maize*, 16-575 (La. App. 5

Cir. 6/15/17), 223 So.3d 633, 649, *writ denied*, 17-1265 (La. 4/27/18), 241 So.3d 306.

On appeal, an improper reference to other crimes evidence is subject to the harmless error rule, i.e., whether the verdict actually rendered in the case was surely unattributable to the error. *See State v. Nelson*, 02-65 (La. App. 5 Cir. 6/26/02), 822 So.2d 796, 804-05, *writ denied*, 02-2090 (La. 2/21/03), 837 So.2d 627.

In the instant case, we find the evidence that defendant possessed ecstasy pills at the time of his arrest was properly admitted under the *res gestae* doctrine because it formed an integral part of the investigation and defendant's arrest. In the Instagram messages between Jerryco Johnson and another individual, defendant was implicated as robbing the victim of his ecstasy pills. Therefore, defendant having ecstasy in his possession during his arrest for murder was probative and relevant because it established his motive and intent for robbing and killing the victim.

Even assuming the trial court erred by admitting evidence that defendant possessed ecstasy pills at the time of his arrest, the error was harmless since the verdict was surely unattributable to any error as the other evidence admitted at trial was sufficient to support defendant's convictions. The evidence shows that defendant called the victim on his cell phone a few minutes before he was murdered and that defendant contacted the victim several times on the morning of the murder directing the victim to the meeting location. Defendant's cell phone was located approximately one mile from the area of the murder just before the murder occurred. Additionally, defendant's DNA was found at the crime scene on a cigarette next to the victim's body. Further, Ms. Reed, an eyewitness at the time of the incident, positively identified defendant, Jerryco Johnson, and Charles Johnson in photographic lineups as the perpetrators.

In light of the foregoing, the trial court did not abuse its discretion by admitting the Instagram messages into evidence or allowing evidence that defendant possessed ecstasy pills at the time of his arrest.

**Excessive Sentence**

In his final assignment of error, defendant argues that the trial court erred when it imposed a consecutive sentence for two of the three counts even though all three counts involved the exact same facts and circumstances. However, we will not address this issue because our Errors Patent review indicates that the trial court imposed an indeterminate sentence with respect to the consecutive/concurrent nature of the sentences. The transcript reflects that on February 7, 2022, the trial court sentenced defendant as follows:

> State v. Michael Adams with respect to count one, second degree murder, the Court hereby sentences you to life in prison without the benefit of probation, parole or suspension of sentence. The Court further designates this as a crime of violence. Count two, conspiracy to commit armed robbery, the Court in considering the prior convictions being of a similar nature concerned over another crime of violence, the Court hereby sentences you to 50 years to run consecutive to any and all other sentences on count two. Again, this is designated as a crime of violence. With respect to count three, convicted felon with a firearm and possession of a firearm, the Court sentences you to 20 years without benefit. That's to run concurrent with counts one and two.

The sentence is indeterminate because the trial court mistakenly ordered the sentence on count two to run consecutive to count two, rather than one of the other counts. The sentencing minute entry reflects that defendant was sentenced to "life in prison at H.L. on count 1 consecutively. 50 years H.L. on count 2 consecutively. 20 years H.L. on count 3 concurrently." However, where there is a discrepancy between the minutes and the transcript, the transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983).

La. C.Cr.P. art. 879 requires the trial court to impose a determinate sentence. If a sentence is indeterminate in violation of La. C.Cr.P. art. 879, it should be

remanded for the trial judge to clarify the sentence on resentencing. *State v. Lai*, 04-1053 (La. App. 5 Cir. 4/26/05), 902 So.2d 550, 562, *writ denied*, 05-1681 (La. 2/3/06), 922 So.2d 1175. In *State v. Havies*, 22-133 (La. App. 5 Cir. 12/22/22), 2022 WL 17843101, in an error patent review, this Court stated that based on the sentencing transcript, the trial court ordered the defendant's sentence on count four to run both concurrently and consecutively with the defendant's sentences as to counts one, two, and three and did not specify whether the defendant's sentence as to count five was to run concurrently or consecutively with his other sentences. As a result, this Court found that the defendant's sentences on counts four and five were indeterminate. Therefore, this Court vacated the defendant's sentences on counts four and five and remanded to the trial court for resentencing on these counts. This Court further stated that because the defendant's sentences on counts four and five were vacated and the case remanded for resentencing, it was pretermitting discussion or review of the defendant's assignments of error pertaining to his sentences. *Id.* at *9-10.

In the instant case, the trial court ordered the sentence on count two "to run consecutive to any and all other sentences on count two." It appears that the trial court misspoke. In addition, the trial court ordered the sentence on count three to run concurrently with the sentences on counts one and two. Accordingly, it appears that the trial court intended to order the sentence on count two to run consecutively with the sentences on counts one and three and the sentence on count three to run concurrently with the sentences on counts one and two. However, as stated in the controlling transcript, the sentence is indeterminate as to whether they are to run concurrently or consecutively.

We further find that the trial court imposed an illegal sentence on count two, conspiracy to commit armed robbery with a dangerous weapon, in that the trial court sentenced defendant to fifty years imprisonment when the statutes only

provide for a forty-nine-and-a-half year sentence. See La. R.S. 14:26 and La. R.S. 14:64.

Accordingly, we vacate the sentences on counts two and three and remand for resentencing, pretermitting any discussion or review of defendant's assignment of error regarding his sentences.

**ERROR PATENT DISCUSSION**

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). The review reveals no errors patent in this case that require corrective action except for the error patents discussed above with respect to defendant's assignment of error relating to his sentences.

**CONVICTIONS AFFIRMED; SENTENCES ON COUNTS TWO AND THREE VACATED AND REMANDED FOR RESENTENCING**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
CORNELIUS E. REGAN, PRO TEM

JUDGES



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 10, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 22-KA-271

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE SHAYNA BEEVERS MORVANT (DISTRICT JUDGE)
ANNE M. WALLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          JANE L. BEEBE (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LINDSAY L. TRUHE (APPELLEE)
DISTRICT ATTORNEY
ZACHARY P. POPOVICH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053